UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ABDELGADIR ABOEID, MONA                             :
ABDELGADIR, and ABDELGADIR ABOEID     :
ON BEHALF OF HIS SEVEN MINOR              :
CHILDREN,                                                      :
                                                                     :     DECISION AND ORDER
                                                                     :     10-CV-2518 (WFK) (VVP)
                       Plaintiffs,                        :
                                                                     :
                                                                     :
         -against-                                          :
                                                                     :
SAUDI ARABIAN AIRLINES CORPORATION,  :
                                                                     :
                       Defendant.                       :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge**

      Abdelgadir Aboeid ("Mr. Aboeid"), his wife Mona Abdelgadir ("Mrs. Abdelgadir"), and

Mr. Aboeid on behalf of their seven minor children (collectively, "Plaintiffs") commenced this

action against Saudi Arabian Airlines Corporation ("Defendant" or "Saudi Airlines"). This

action arises from a series of events beginning with Defendant's allegedly discriminatory

treatment of the Aboeid family at John F. Kennedy International Airport ("JFK") and ending

with the family missing their return flight back to the United States and being stranded in Saudi

Arabia for more than a week. Plaintiffs seek recovery on four causes of action: (1) breach of

contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of their

civil rights under 42 U.S.C. § 1981 ("Section 1981"); and (4) violation of their civil rights under

N.Y. Executive Law § 296 (the "New York Human Rights Law" or the "NYHRL"). Plaintiffs

move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the

issue of liability only. For the reasons stated below, the Court denies the motion for summary

judgment in all respects.

## I.      Factual Background

The following facts are either undisputed by the parties, or, to the extent any facts are disputed or ambiguous, taken in the light most favorable to Defendant, the non-moving party.

### A.  The Departure Flight of the Plaintiffs

On February 20, 2008, Mr. Aboeid purchased nine roundtrip tickets aboard Saudi Airlines for him and his family to travel from JFK to Khartoum, Sudan, with layovers in Saudi Arabia on both the departure and return flights.  Def.'s Rule 56.1 Statement ("Def.'s 56.1 St.") at ¶ 1.[1]  The family's trip was scheduled to begin on June 7, 2008, with the departure layover in Riyadh, Saudi Arabia, and the family was scheduled to return to JFK on July 24, 2008, with the return layover in Jeddah, Saudi Arabia.  *Id.*  Plaintiffs' tickets were labeled nonrefundable, nonreroutable, and nonendorseable.  *Id.* at ¶ 5.  Mr. Aboeid purchased the tickets from a travel agent based in North Carolina, where Plaintiffs reside.  Defs.' Br., Ex. C ("Dep. Tr. of Abdelgadir Aboeid" or "Abdelgadir Dep. Tr.") at 5:3–14, 13:2–15.  Saudi Airlines is a corporation existing under the laws of Saudi Arabia, with its principal place of business in Jeddah.  Def.'s Answer at ¶ 6.  Saudi Airlines does business in New York and maintains an office at JFK.  *Id.*

Plaintiffs' outbound flight from JFK was scheduled to depart at 2:00 P.M. on June 7, 2008.  Def.'s 56.1 St. at ¶ 19.  Plaintiffs arrived at the check-in counter at approximately 12:00 P.M. that day.  *Id.*  According to Plaintiffs, the Saudi Airlines check-in counter was not yet open when they arrived.  *Id.*  However, Sevan Jacoby, the Saudi Airlines employee who oversaw the check-in counters on June 7, 2008, claimed at her deposition the check-in counters "automatically" open at 10:00 A.M. for a 2:00 P.M. flight and that those counters were indeed

---

[1] By citing to the parties' Local Civil Rule 56.1 Statements of Undisputed Facts, the Court incorporates by reference all relevant sources cited therein.

open and manned at 10:00 A.M. on that day.  Defs.' Br., Ex. B ("Jacoby Dep. Tr.") at 6:8–13,
8:15–18, 12:24–13:8, 20:15–21, 21:9–16.

Plaintiffs were among the first few people in line to check-in at the Saudi Airlines
counters.  Pls.' Rule 56.1 Statement ("Pls.' 56.1 St.") at ¶ 20.  In total, the Aboeid family had
eighteen pieces of luggage to check in for their flight.  Def.'s 56.1 St. at ¶ 22.  When Mr. Aboeid
reached the Saudi Airlines check-in counter, he handed his family's passports and tickets to a
female ticketing agent.  Abdelgadir Dep. Tr. at 22:18–23:10.  However, the agent did not run the
passports through a computer or take the family's documentation to an office for closer review.
*Id.* at 24:10–25:18; Def.'s 56.1 St. at ¶ 24; Pls.' Br. at 5.  Instead, the woman handed the family's
papers back to Mr. Aboeid and asked the family to leave the line and wait by a windowed area of
the terminal.  Abdelgadir Dep. Tr. at 24:10–25:18; Def.'s 56.1 St. at ¶ 24.  As Plaintiffs waited
off to the side, passengers who had been standing in line behind the Aboeid family checked in
without incident.  Pls.' 56.1 St. at ¶ 25.  According to Plaintiffs, they were the only black people
awaiting check-in for the outbound Saudi Airlines flight.  *Id.* at ¶ 27.  After some time, the
Aboeid family was allowed to check in and board the plane shortly before the flight closed.  Pls.'
56.1 St. at ¶ 26; Pls.' Br., Ex. 25 ("Susan Aboeid Dep. Tr.") at 175:19–25.

At her deposition, Sevan Jacoby expressed skepticism that the Aboeid family would be
asked to exit the check-in line and wait to the side without explanation, as Saudi Airlines
employees "make sure . . . passengers understand why they're outside the line."  Jacoby Dep. Tr.
at 57:5–21.  She stated one of the possible reasons why the airline's employees would ask a
passenger to wait outside the line is the need to conduct further security screening, in which case
a Saudi Airlines employee would take the passenger's passport to an office and check it against a
no-fly list.  *Id.* at 57:14–18.  Ms. Jacoby also suggested the Aboeid family's large number of

bags may have caused some delay due to the need for manual weighing of the bags. *Id.* at 55:11–56:25. Specifically, Ms. Jacoby explained that if a group of passengers has a large number of bags, airline employees would use a "big major scale" to manually weigh each bag and then report that information to the check-in agent. *Id.* However, Ms. Jacoby did not personally observe the Aboeid family's wait or check-in on June 7, 2008, *see generally* Jacoby Dep. Tr., nor are there any facts suggesting Saudi Airlines employees withheld Plaintiffs' passports or took them to an office for screening.

When Plaintiffs were finally allowed to board the plane, Mrs. Abdelgadir and the seven Aboeid children were seated in the same row. Defs.' 56.1 St. at ¶ 30. Mr. Aboeid, however, was seated several rows behind his family. *Id.*; Abdelgadir Dep. Tr. at 29:1–13. Defendant's "Passengers Services Procedures Manual" provides that passengers should be seated in such a way so as to avoid separation of families and groups. Pls.' Br., Ex. 30. The Manual also explains that seat assignment is determined at the time of check-in—*i.e.*, on a first-come, first-serve basis. *Id.*; *see also* Jacoby Dep. Tr. at 53:10–19.

### B.  Plaintiffs' Return Flight

At the end of their trip, Plaintiffs flew from Khartoum to Jeddah on July 21, 2008. Pls.' 56.1 St. at ¶ 2. Their return flight from Jeddah to JFK was scheduled to depart at 2:20 A.M. on July 24, 2008.[2] Def.'s Opp., Ex. 7-A-5 ("Aboeid Family PNRs"). According to Sami Bagader, an executive supervisor of passenger services for Defendant, a flight "closes" one hour before departure such that in the normal course of events, boarding for Plaintiffs' return flight from Jeddah would have ended at 1:20 A.M. Defs.' Br., Ex. A ("Bagader Dep. Tr.") at 11:8–15, 87:24–88:4. A passenger will not be allowed to check in or be issued a boarding pass if he

---

[2] Though the record contains conflicting deposition testimony regarding the scheduled departure time for Plaintiffs' return flight, documentary evidence and Defendant's own admission, *see* Bagader Dep. Tr. at 86:24–87:2, lead the Court to conclude any reasonable trier of fact would find the departure time was 2:20 A.M.

arrives at the check-in counter after the flight has closed, even if the passenger has a confirmed reservation, ticket, passport, and other required documentation. *Id.* at 90:21–91:9. Moreover, such late-arriving passengers are not entitled to "denied boarding" compensation, which is a monetary sum not to exceed the value of the ticket. *Id.* at 91:10–19; Pls.' Br., Ex. 44 ("Passenger Services Procedures Manual") at 216–17.

Conversely, if a passenger comes to the check-in counter with the appropriate documentation before his flight closes, that passenger is entitled to either board the plane or receive denied boarding compensation. *See* Passenger Services Procedures Manual at 216 ("The passenger must report to the airport on time fixed by [Defendant] prior to the scheduled departure time."); Am. Compl., Ex. C ("Saudi Arabian Airlines Terms, Conditions, Passenger Advice, Notices and Liability Limitations") (passengers must "arrive at airport by time fixed by [Defendant] or, if no time is fixed, early enough to complete departure procedures"). Saudi Airlines policy prohibits standby or non-revenue passengers from boarding before ensuring passengers with confirmed reservations are first accommodated. *Id.* at 214–15. If a flight is oversold due to an excess number of confirmed reservations, confirmed passengers who arrive on time but are not able to board the plane will receive denied boarding compensation. *See id.* at 216–18; Bagader Dep. Tr. at 96:4–10. Under those circumstances, Defendant would also provide the passenger with hotel accommodations, meals, rescheduling on another flight at no added expense to the passenger, and means of communicating with friends or family. Bagader Dep. Tr. at 96:11–22.

Mr. Aboeid and his family arrived at the Jeddah airport at approximately 12:00 A.M. on July 24, 2008. Abdelgadir Dep. Tr. at 44:10–13, 45:22–25. The Aboeid family was directed by a Saudi Airlines employee to check in at the international flights counter on the third floor of the

terminal. *Id.* at 47:16–23. The family walked to the third floor and stood in line for about one hour and fifteen minutes, only to have a customer service representative inform the family they were on the wrong line and that check-in for flights to New York was at a different "special flights" counter. *Id.* at 48:19–50:10. Plaintiffs were the only black people in line at the time, and Mr. Aboeid believes Saudi Airlines employees did not help the family earlier because they were of African descent. *Id.* at 50:13–51:9.

Plaintiffs left the line and walked to the special flights section of the terminal. *Id.* at 55:19–21. When Plaintiffs finally arrived at the correct check-in counter, it was approximately 1:20 A.M. *Id.* at 56:14–23. A black man ahead of the Aboeid family had been told he could not board the flight, but he was eventually allowed to board after shouting and screaming at Saudi Airlines employees. *Id.* at 51:18–52:5. The passenger behind the black man had also been told he could not board because the flight was fully booked, but he was likewise allowed to board after telling the ticketing agents he was traveling with a Saudi prince. *Id.* at 52:5–10. The Aboeid family of nine, however, was not allowed to board. When Mr. Aboeid handed his family's tickets and passports to the ticketing agent, the agent said the flight was full and would not check in Plaintiffs, despite Mr. Aboeid's protestations that the family had confirmed reservations for the flight. *Id.* at 56:24–57:20.

Ultimately, Defendant's July 24, 2008 return flight from Jeddah departed without Plaintiffs. The return flight left with three empty seats, though Saudi Airlines had previously filled eleven seats with non-revenue passengers and standby passengers, who lacked confirmed reservations. Bagader Dep. Tr. at 108:17–21, 109:9–12; Def.'s 56.1 St. at ¶ 3. Defendant's computer-generated records regarding Plaintiffs' return flight show that all nine members of the Aboeid family were designated as "no shows," indicated by the letters "NS" on the Passenger

6

Name Records ("PNR").  Bagader Dep. Tr. at 103:9–17; Aboeid Family PNRs.  The PNRs do

not classify Plaintiffs as having been "denied boarding," indicated by the notation "DB," which

would have been the case had Plaintiffs checked in on time for an oversold flight.  Bagader Dep.

Tr. at 95:20–22, 108:22–109:8.  Moreover, Sevan Jacoby testified that while she normally

receives notice whenever a passenger is "denied boarding," she did not receive any such notice

regarding Plaintiffs.  Jacoby Dep. Tr. at 118:17–24.  If Plaintiffs checked in on time, they should

have been given priority over the standby and non-revenue passengers and been allowed to

board, pursuant to Saudi Airlines policy.  *See* Bagader Dep. Tr. at 109:7–12.

### C.  Plaintiffs' Attempts to Return Home

Plaintiffs were told by Saudi Airlines employees to "come back tomorrow" to seek

alternative passage back to the United States.  Pls.' 56.1 St. at ¶ 4.  Plaintiffs spent the next two

nights sleeping on the floor of the airport mosque and several more days in a hotel.  Abdelgadir

Dep. Tr. at 62:9–63:12.  Ultimately, Plaintiffs were stranded in Jeddah for eleven days.[3]

Defendant did not provide Plaintiffs with replacement tickets, meals, shelter, telephone cards, or

other assistance during this time.  Def.'s 56.1 St. at ¶ 10.

Mr. Aboeid traveled to Saudi Airlines' offices every day for approximately one week

and, upon each visit, Saudi Airlines employees encouraged Plaintiffs to wait until the next day

for a return flight back to the United States.  Abdelgadir Dep. Tr. at 101:12–103:14.  Plaintiffs

allege that on several occasions during Mr. Aboeid's daily trips to the Saudi Airlines offices,

Defendant's employees referred to Mr. Aboeid as a "zebra" and a "slave" and told him only

other black employees at another location could help him.  Pls.' 56.1 St. at ¶ 13; Abdelgadir Dep.

Tr. at 67:25–68:19.  On July 31, 2008, a Saudi Airlines employee told Mr. Aboeid the airline

---

[3] Plaintiffs claim they were marooned in Saudi Arabia for thirteen days after their originally scheduled departure date of July 24, 2008. Pls.' 56.1 St. at ¶ 10. However, given that Plaintiffs departed Saudi Arabia on August 3, 2008, *see infra*, Plaintiffs could not have spent more than eleven additional days in Saudi Arabia.

would not be able to help Plaintiffs get back to New York after all.  Abdelgadir Dep. Tr. at

101:24–103:24.  In the end, Plaintiffs purchased tickets on Egypt Air to JFK by way of Cairo,

Egypt; Plaintiffs departed on an Egypt Air flight from Saudi Arabia on August 3, 2008.  Pls.'

56.1 St. at ¶ 11; Abdelgadir Dep. Tr. at 62:17–64:14.

### D. Post-Trip Complaints and Developments

After finally returning to the United States, Plaintiffs discovered Saudi Airlines had lost

three pieces of their luggage, and though the airline later found and returned two of the bags, one

bag was never recovered.  Abdelgadir Dep. Tr. at 66:21–67:12.  Defendant also refused to refund

Plaintiffs for their unused return tickets from Jeddah to JFK.  *Id.* at 69:3–13.

Mr. Aboeid sent a written complaint to Defendant regarding the family's treatment in

Jeddah, with copies of the letter sent to his Congressman and the United States Department of

Transportation.[4]  *See* Pls.' Br., Ex. 33 ("Correspondence Regarding Plaintiffs' Complaints").

Plaintiffs also wrote to Defendant regarding their lost luggage.  *See id.*  None of these written

communications complained of race discrimination by Defendant or its employees.  Abdelgadir

Dep. Tr. at 81:13–16.  Defendant's Baggage Services Department wrote to Mr. Aboeid on

August 3, 2009, offering to settle Plaintiffs' lost baggage claim for $590.00.  *See*

Correspondence Regarding Plaintiffs' Complaints.  In early October 2009, Defendant responded

to Mr. Aboeid's complaint, with copies sent to Plaintiffs' Congressman and the Department of

Transportation, asserting that it had searched its records but found nothing relating to Plaintiffs'

claims of difficulties in Jeddah.  *Id.*  Plaintiffs commenced this action on June 2, 2010.

---

[4] The record is unclear as to when Mr. Aboeid first sent a written complaint to Defendant, but based on a letter from Defendant to the Better Business Bureau dated May 4, 2009 regarding the Aboeid family's trip aboard Saudi Airlines, it appears Mr. Aboeid first sent a written complaint no later than April 2009.  Pls.' Br., Ex. 33 ("Correspondence Regarding Plaintiffs' Complaints").

## II.    Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried. In determining whether summary judgment is

appropriate, this Court will construe the facts in the light most favorable to the non-moving party

and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v.

Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal citations and quotation marks omitted).

No genuine issue of material fact exists "where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel,

Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing

sufficient to establish the existence of [each] element to that party's case . . . since a complete

failure of proof concerning an essential element of the non-moving party's case necessarily

renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986);

*accord Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts

reveal that there is an absence of sufficient proof as to one essential element of a claim, any

factual disputes with respect to other elements become immaterial and cannot defeat a motion for

summary judgment."). Importantly, if the evidence produced by the non-moving party "is

merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

9

### III. Discussion

#### A. Evidentiary Issues

Before reaching the merits of Plaintiffs' motion, the Court must address Plaintiffs' evidentiary challenge to the deposition testimony of Sami Bagader.  Plaintiffs urge the Court to exclude all of Mr. Bagader's testimony for three reasons:  (1) Mr. Bagader fails to meet the competency requirements of Rule 30(b)(6) of the Federal Rules of Civil Procedure; (2) Mr. Bagader's testimony was largely hearsay; and (3) Mr. Bagader's testimony conflicted with that of Sevan Jacoby, another Rule 30(b)(6) witness.  Pls.' Reply at 5–8.  The Court addresses each argument in turn.

#### 1. Rule 30(b)(6) Witness Competency

Federal Rule of Civil Procedure 30(b)(6) permits a party to subpoena an organization to produce a representative available to "testify about information known or reasonably available to the organization" regarding the matters for examination set forth in the party's notice of subpoena.  Plaintiffs assert Mr. Bagader was not a competent Rule 30(b)(6) witness because he lacked personal knowledge of the circumstances surrounding Plaintiffs' experience in Jeddah and because he was not otherwise adequately familiar with said circumstances.  Pls.' Reply at 5–7.

A Rule 30(b)(6) deponent does not require "personal knowledge of the matters identified in the [deposition] notice," so long as "the corporation on whose behalf the designee is testifying . . . prepare[s] the designee so that he may provide 'knowledgeable and binding answers for the corporation.'"  *Tailored Lighting, Inc. v. Osram Sylvania Products, Inc.*, 255 F.R.D. 340, 349 (W.D.N.Y. 2009) (Payson, M.J.); *see also S.E.C. v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992) (Leisure, J.) (rejecting argument that "firsthand knowledge and involvement in the underlying transaction is required for a Rule 30(b)(6) deposition"); *Spanski Enters., Inc. v. Telewizja Polska,*

*S.A.*, No. 07 Civ. 930, 2009 WL 3270794, at *3 (S.D.N.Y. Oct. 13, 2009) (Lynch, Circuit Judge) ("Rule 30(b)(6) deponents need not have personal knowledge concerning the matters set out in the deposition notice.  If they do not possess such personal knowledge, however, the corporation is obligated to prepare them so that they may give knowledgeable answers.") (internal citations omitted).  Thus, "[t]he deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997) (Francis, M.J.).

During Mr. Bagader's deposition, Plaintiffs' counsel persistently asked the witness whether he had personal knowledge of the circumstances surrounding Plaintiffs' failed attempt to board the return flight from Jeddah.  Bagader Dep. Tr. at 37:4–13, 54:8–9, 80:13–16, 107:5–22.  Mr. Bagader readily admitted that the only bases for his testimony were the documents set forth before him and his thirty years of experience as an employee of Defendant. *Id.* at 10:19–25, 95:11–19, 108:9–11.  However, Mr. Bagader indicated that he had adequately reviewed relevant documents prior to his Rule 30(b)(6) deposition. *Id.* at 19:3–5, 20:22–21:7, 22:5–9, 25:10–26:20, 67:2–20.

Plaintiffs' argument that Mr. Bagader was an incompetent Rule 30(b)(6) witness is without merit.  Though Mr. Bagader did not personally observe Plaintiffs' ordeal in Jeddah, he acquainted himself with pertinent documentary evidence, and Plaintiffs do not suggest that Mr. Bagader is unqualified to interpret or explain the meaning of that evidence.  Under these circumstances, Mr. Bagader was sufficiently prepared to give knowledgeable answers regarding what happened to Plaintiffs at the gate for their departure flight on July 24, 2008 based on the evidence before him. *See, e.g., Tailored Lighting*, 255 F.R.D. at 349.

11

### 2. Hearsay

Plaintiffs also raise hearsay objections to those portions of Mr. Bagader's testimony that rely on Defendant's computer-generated records. Pls.' Reply at 6–7. As a general rule, hearsay statements are not competent evidence and thus cannot be considered on a motion for summary judgment. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999). However, "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007) (Karas, J.) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)). Under Rule 803(6) of the Federal Rules of Evidence, a record of a particular act or event is admissible hearsay if

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Defendants' computer-generated records, though hearsay, would presumably be admissible at trial under the business records exception. *See* Fed. R. Evid. 803(6); *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the 'original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice.'") (citation omitted). Specifically, Defendant could likely produce a records custodian at trial who could testify that the computer-generated records regarding Plaintiffs' return flight from Jeddah were created at or near the time of the flight based on information transmitted by a gate agent or other knowledgeable employee, that

12

the records were kept in the course of Defendant's airline business, and that making the record was a regular practice of that business. Furthermore, Plaintiffs have proffered no reason to doubt the source of information or the method or circumstances of preparing the computer-generated records such as might indicate a lack of trustworthiness. Therefore, because Defendant's computer-generated records would likely be admissible at trial, the Court rejects Plaintiffs' hearsay argument.

### 3. Conflicting Testimony

Finally, Plaintiffs argue Mr. Bagader's testimony must be stricken because it contradicts the earlier testimony of Sevan Jacoby, Defendant's other Rule 30(b)(6) witness. Pls.' Reply at 7–8. Ms. Jacoby testified that Plaintiffs' PNRs did not designate Plaintiffs as "no shows" for their July 24, 2008 return flight from Jeddah. Jacoby Dep. Tr. at 71:7–10. Six months later, Mr. Bagader testified that the PNRs in fact indicated Plaintiffs were "no shows" in Defendant's computer system and circled the "NS" notations reflecting the same. Bagader Dep. Tr. at 103:9–17, 105:13–25; Aboeid Family PNRs.

The Court rejects Plaintiffs' argument for several reasons. First, it is not clear the rule against contradicting earlier deposition testimony applies in this case. In *Perma Research & Development Co. v. Singer Co.*, the Second Circuit rejected the notion that a party could create a genuine issue of fact at the summary judgment stage "simply by submitting an affidavit contradicting his own prior testimony." 410 F.2d 572, 578 (2d Cir. 1969). The "sham affidavit" rule explicitly contemplates a later contradictory affidavit. *See id.*; *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) ("[A] party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact."); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("[A] party's affidavit which contradicts his own prior deposition

testimony should be disregarded on a motion for summary judgment."). The *Perma Research*
Court cautioned that a litigant should not be able to contradict four days of deposition-taking and
cross-examination with a single sworn statement. 410 F.2d at 578. In this case, Plaintiffs ask the
Court not to preclude a contradictory affidavit, but the deposition testimony of a witness who
was subject to cross-examination. Plaintiffs cite no authority, nor is the Court aware of any
authority, which applies the "sham affidavit" rule to subsequent contradictory deposition
testimony. Under these circumstances, the *Perma Research* rule does not apply, and it would be
inappropriate to preclude Mr. Bagader's deposition testimony on that basis.

Moreover, while a Rule 30(b)(6) witness's testimony is binding on the organization that
designates the witness, *see LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489,
517 (S.D.N.Y. 2012) (Engelmayer, J.), it is unclear that the "sham affidavit" rule applies to two
different Rule 30(b)(6) witnesses. *Perma Research* and its progeny typically involve non-Rule
30(b)(6) witnesses, testifying on their own behalf, who later contradict themselves. They do not
address the question of whether the deposition testimony of a second Rule 30(b)(6) witness,
which contradicts a different Rule 30(b)(6) witness' testimony, should be disregarded on a
motion for summary judgment. Even if the Court were to treat Ms. Jacoby and Mr. Bagader as
the same witness, "[t]o the extent that there is a conflict in a witness's testimony, such a conflict
affects the weight of the testimony, not its admissibility." *Palazzo*, 232 F.3d at 44.

Finally, "a party's deposition testimony as to a given fact does not foreclose a trial or an
evidentiary hearing where that testimony is contradicted by evidence other than the deponent's
subsequent affidavit, for when such other evidence is available, the concern that the proffered
issue of fact is a mere 'sham' is alleviated." *Id.* at 43–44. Here, it is not only Mr. Bagader's
testimony that is at odds with Ms. Jacoby's testimony; the "NS" notation appears on the Aboeid

family's PNRs in at least two locations. Therefore, Mr. Bagader's testimony was not a naked

attempt to escape the consequences of Ms. Jacoby's earlier deposition, but was instead supported

by documentary evidence. There is thus little danger that Mr. Bagader gave "sham" testimony.

For all these reasons, the Court will not exclude Mr. Bagader's testimony in considering

Plaintiffs' motion for summary judgment.

### B. Breach of Contract

Plaintiffs argue Defendant breached its contracts with the Aboeid family by failing to

board Plaintiffs on their return flight from Jeddah, failing to provide alternative return passage to

the United States, failing to provide lodging and other accommodations as the family attempted

to secure alternative return passage, and failing to refund Plaintiffs for the cost of their unused

return tickets. Pls.' Br. at 12–15. Defendant responds, in effect, that it did not breach its

contracts with the Aboeid family because Plaintiffs failed to perform the conditions of the

contracts by not arriving at the check-in counter in Jeddah until after the flight had closed,

absolving Defendant of any contractual obligation to provide "denied boarding" compensation or

other accommodations. Def.'s Opp. at 5–6.

Neither Plaintiffs nor Defendant have identified the jurisdiction whose substantive

contract law properly applies to this dispute—an inquiry that must be resolved before addressing

the merits of the parties' arguments. "In undertaking this task, the Court looks to New York's

choice of law rules." *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 456

(E.D.N.Y. 2007) (Dearie, C.J.) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989)).

"Under New York's rules, the 'first question to resolve in determining whether to

undertake a choice of law analysis is whether there is an actual conflict of laws." *Id.* at 457

(quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)). "If no conflict is found between

the law of the forum and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum." *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008) (Castel, J.).  However, where the parties fail to brief the choice of law issue and rely exclusively on New York law, the parties implicitly consent to the application of New York law. *See Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989).  In this case, there are three jurisdictions whose substantive law might apply:  New York, North Carolina, and Saudi Arabia.

The Court concludes that New York law properly governs Plaintiffs' breach of contract claim.  Although the parties' briefing on the breach of contract issue is sparse, what little authority they do cite almost exclusively relies on New York law.  This fact strongly counsels in favor of application of New York law. *See Tehran-Berkeley Civil & Envtl. Eng'rs*, 888 F.2d at 242 ("Iranian law could apply, since the contract was executed and performed in that country. The parties' briefs, however, rely on New York law.  Under the principle that implied consent to use a forum's law is sufficient to establish choice of law, we will apply New York law to this case.") (internal citation omitted); *Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 294 (2d Cir. 1986) ("Although [plaintiff] does not concede that New York law would apply, he, like [defendant], cites only New York cases.  Under these circumstances we do not feel obliged to undertake an investigation to determine whether there is any difference in the California law and what law a California court would apply if there were.").  Moreover, neither side has proposed the Court apply the law of North Carolina or Saudi Arabia, much less demonstrated how those jurisdictions' laws would differ from the law of New York.  This fact provides further support for the application of New York law. *See Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.*, 919 F. Supp. 149, 152 (S.D.N.Y. 1996) (Batts, J.) ("In New York, it is required

that a party wishing to apply the law of a foreign state show how that law differs from the forum

state's law.  Failure to do so results in the application of New York law.") (citations omitted).

Therefore, the Court will apply New York law to Plaintiffs' claim for breach of contract.

   Turning to the merits of the breach of contract claim, the Court concludes there are

genuine issues of material fact that preclude summary judgment in favor of Plaintiffs.  "To state

a claim in federal court for breach of contract under New York law, a complaint need only allege

(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3)

breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348

(2d Cir. 1996); *see also Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 925 F. Supp.

203, 206 (S.D.N.Y. 1996) (Conner, J.).  "Under New York law, the initial interpretation of a

contract 'is a matter of law for the court to decide,'" and where the contract is unambiguous, a

court is "required to give effect to the contract as written." *K. Bell & Assocs., Inc. v. Lloyd's*

*Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996).

   In this case, the relevant contracts are Plaintiffs' nine plane tickets, for "[i]n the

transportation of passengers, the relevant transportation contract is generally the passenger

ticket." *Shen v. Japan Airlines*, 918 F. Supp. 686, 688 (S.D.N.Y. 1994) (Stanton, J.); *see also In*

*re Nigeria Charter Flights*, 520 F. Supp. 2d at 459.  The tickets were subject to various terms

and conditions.  *See* Saudi Arabian Airlines Terms, Conditions, Passenger Advice, Notices and

Liability Limitations.  One of those conditions required passengers to "arrive at airport by time

fixed by [Defendant] or, if no time is fixed, early enough to complete departure procedures." *Id.*

In addition, according to Defendant's Passenger Services Procedures Manual, passengers are

entitled to "denied boarding compensation" only if they "report to the airport on time fixed by

17

[Defendant] prior to the scheduled departure time." Passenger Services Procedures Manual at 216.

The parties do not dispute Plaintiffs and Defendant entered into a contractual agreement when Plaintiffs purchased their airline tickets. However, there is a triable issue of fact as to whether Plaintiffs fully performed their contractual obligations. On a motion for summary judgment, the Court must construe the facts in the light most favorable to Defendant, the non-moving party, and must resolve all ambiguities and draw all reasonable inferences against Plaintiffs. *Brod*, 653 F.3d at 164. There is evidence in the record from which a rational factfinder could determine Plaintiffs did not arrive at the check-in counter in Jeddah until after boarding had closed for their return flight to JFK, in violation of the conditions of Plaintiffs' tickets. For instance, in his own deposition, Mr. Aboeid indicated Plaintiffs did not reach the check-in counter until 1:20 A.M., even though check-in for the Aboeid family's flight ended at 1:20 A.M. *See* Abdelgadir Dep. Tr. at 43:8–12, 56:14–23; Bagader Dep. Tr. at 11:8–15, 87:24–88:4. Moreover, Defendant's computer-generated records show that Plaintiffs were designated as "no shows" for their return flight to JFK, indicating Plaintiffs arrived too late. *See* Bagader Dep. Tr. at 103:9–17; Aboeid Family PNRs. While the record is unclear as to whether Defendant communicated to Plaintiffs a "fixed time" by which they had to check in for their return flight, at the least, the record could lead a rational trier of fact to find Plaintiffs did not perform their obligations under the contract because they did not "arrive at airport . . . early enough to complete departure procedures." Saudi Arabian Airlines Terms, Conditions, Passenger Advice, Notices and Liability Limitations. Therefore, the Court denies Plaintiffs' motion for summary judgment as to their claim for breach of contract. *See, e.g., Giuffre v. Delta Air Lines, Inc.*, No. 10-cv-1462, 2012 WL 3988981 (E.D.N.Y. Sept. 11, 2012) (Irizarry, J.)

(airline did not breach contract because plaintiffs failed to check in at least one hour before scheduled departure time as required by ticket terms and conditions).

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs also assert a claim for breach of the implied duty of good faith and fair dealing. Plaintiffs predicate this claim on two categories of behavior. First, Plaintiffs argue Defendant "breached its covenant of good faith and fair dealing, when it decided to refuse to fly the Plaintiffs because they were Black or for any reason whatsoever" and did not rebook or refund the Plaintiffs. Am. Compl. at ¶¶ 37, 40. Second, Plaintiffs claim Defendant acted in bad faith in its dealings with Plaintiffs in relation to the present litigation. *See* Pls.' Br. at 21–22. For example, Plaintiffs assert Defendant lied to Plaintiff's Congressman, the United States Department of Transportation, and Plaintiffs when it represented that a search of its records had yielded no information regarding Plaintiffs' alleged mistreatment in Jeddah, even though Defendant produced almost a thousand pages of relevant discovery documents one year later. *Id.* at 9, 21. Plaintiffs also allege Defendants fabricated facts and otherwise acted in an unseemly manner during discovery, unnecessarily increasing the length and cost of the present litigation. *Id.* at 21–22.

The Court denies Plaintiffs' motion for summary judgment as to their claim for breach of the covenant of good faith and fair dealing. "Under New York law, parties to an express contract are bound by an implied duty of good faith, 'but breach of that duty is merely a breach of the underlying contract.'" *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). Therefore, "if the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous

19

as no additional claim is actually stated." *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010) (internal editing and quotation marks omitted).

To the extent Plaintiffs' claim for breach of the covenant of good faith and fair dealing is predicated on Defendants' refusal to board the Aboeid family in Jeddah, book them on another flight, or refund Plaintiffs' tickets, the claim duplicates their breach of contract claim and may be "disregarded as superfluous." *Id.*; *see also Cruz v. FXDirectDealer, LLC*, No. 12-1252-cv, 2013 WL 3021904, at *8 (2d Cir. June 19, 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."). Separately, Plaintiffs cite no cases and the Court is aware of no authority, much less Second Circuit precedent, for the proposition that Defendant's alleged misbehavior during the course of this litigation can support a claim for breach of the covenant of good faith and fair dealing. Plaintiffs' claim is an inappropriate vehicle for their grievances as to Defendant's conduct in this litigation. To the extent Plaintiffs feel they have been aggrieved by Defendant's conduct, they are free to move for sanctions under Rules 11, 30, or 37 of the Federal Rules of Civil Procedure. Accordingly, Plaintiffs' motion for summary judgment as to its claim for breach of the covenant of good faith and fair dealing is denied.

### D. Violations of 42 U.S.C. § 1981 and N.Y. Executive Law § 296

Plaintiffs allege Defendant's treatment of the Aboeid family at JFK and in Jeddah violated Section 1981 and the NYHRL on two separate occasions. First, Plaintiffs argue their segregation during check-in at JFK was racially discriminatory and that such discrimination affected their contractual right to select seats on the outbound flight on a first-come-first-serve

basis. Pls.' Br. at 16–17.  Second, Plaintiffs claim Defendant's refusal to board the Plaintiffs in

Jeddah was a racially-motivated breach of contract, constituting a separate violation of Section

1981.  Am. Compl. at ¶ 51.  In response to Plaintiffs' allegations relating to JFK, Defendant

points to Sevan Jacoby's testimony that Plaintiffs may have been delayed because of the need for

additional security screening, not because of racial discrimination.  Def.'s Opp. at 4–5.

Defendant also argues Plaintiffs may have been delayed due to the need to manually weigh

Plaintiffs' eighteen pieces of checked baggage.  *Id.*  With respect to Plaintiffs' allegations

regarding the events in Jeddah, Defendant argues Plaintiffs were not allowed to board the plane

because Plaintiffs arrived at the check-in counter after the flight had "closed."  *Id.* at 5–6.

"The standards governing claims pursuant to section 1981 and the NYHRL are identical."

*Perez Rivera v. Hertz Corp.*, 990 F. Supp. 234, 236 (S.D.N.Y. 1997) (Jones, J.); *see also Brown*

*v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Mahmud v. Kaufmann*, 454 F. Supp. 2d

150, 157 (S.D.N.Y. 2006) (Conner, J.).  "To establish a claim under 42 U.S.C. § 1981, plaintiffs

must allege facts supporting the following elements:  (1) plaintiffs are members of a racial

minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination

concerning one of the statute's enumerated activities."  *Brown v. City of Oneonta*, 221 F.3d 329,

339 (2d Cir. 1999).  "Those enumerated activities include the rights 'to make and enforce

contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property.'"  *Id.* (quoting 42 U.S.C. § 1981(a)).  The

Supreme Court has unequivocally held that Section 1981 "can be violated only by purposeful

discrimination."  *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982);

*see also Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (en banc) ("Essential to an action

under Section 1981 are allegations that the defendants' acts were purposefully discriminatory

21

and racially motivated.") (internal citations omitted).  "A plaintiff may rely on direct evidence or

circumstantial evidence to prove discriminatory intent." *Harvey v. NYRAC, Inc.*, 813 F. Supp.

206, 209 (E.D.N.Y. 1993) (Glasser, J.) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460

U.S. 711, 714 n.3 (1983)).

      "Where, as here, a plaintiff does not allege any direct evidence of discrimination, he

must proceed under the well-established burden-shifting framework the Supreme Court

developed in *McDonnell Douglas Corp. v. Green*." *Weiss v. La Suisse*, 260 F. Supp. 2d 644, 650

(S.D.N.Y. 2003) (McMahon, J.) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

2000)); *see also Brown*, 673 F.3d at 150 (applying *McDonnell Douglas* framework to Section

1981 and NYHRL claims).  "Under that framework, a plaintiff must first establish a *prima facie*

case.  If the plaintiff establishes a *prima facie* case, 'a presumption of discrimination is created

and the burden of production shifts to the defendant to articulate some legitimate,

nondiscriminatory reason' for the allegedly discriminatory act(s)." *Weiss*, 260 F. Supp. 2d at 650

(quoting *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001)).  Plaintiffs' burden of

establishing a *prima facie* case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506

(1993).  Nevertheless, Plaintiffs must identify "circumstances giving rise to an inference of

discrimination on the basis" of race. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

"When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly

situated in all material respects' to the individuals to whom they compare themselves, their

circumstances need not be identical, but there should be a reasonably close resemblance of facts

and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (internal citation

omitted).

At the second stage of the burden-shifting framework, the defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the [adverse] action." *St. Mary's Honor Ctr.*, 509 U.S. at 507 (internal quotation marks omitted). The Court's analysis at this stage "can involve no credibility assessment" of the defendant's evidence, for the defendant's burden is one of production, not of persuasion. *Id.* at 509. Thus, the defendant need not prove by a preponderance of the evidence that its rationale was non-discriminatory, "but must simply present a clear explanation for the action." *Cretella v. Liriano*, 633 F. Supp. 2d 54, 72 (S.D.N.Y. 2009) (Swain, J.).

"If the defendant bears its burden of production, the presumption of discrimination 'drops from the picture' and the plaintiff 'must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'" *Weiss*, 260 F. Supp. 2d at 650–51 (quoting *Weinstock*, 224 F.3d at 42). At this third stage of the burden-shifting framework, a plaintiff must show "*both* that the [non-discriminatory] reason is false, *and* that discrimination was the real reason" for the defendant's adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at 515; *see also McCarthy v. New York City Technical Coll. of City Univ. of New York*, 202 F.3d 161, 166 (2d Cir. 2000) ("[A defendant's] assertion of false reasons does not eliminate the requirement that the evidence, considered in its entirety, including any inference reasonably drawn from the falsity of the proffered reasons, must be capable of supporting a reasonable finding that the true reason was the prohibited discrimination plaintiff alleges."). While "disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case . . . *permit* the trier of fact to infer the ultimate fact of intentional discrimination," judgment in favor of the plaintiff is by no means compelled in those

circumstances. *St. Mary's Honor Ctr.*, 509 U.S. at 511. Hence, a plaintiff asserting a claim under Section 1981 "at all times bears the 'ultimate burden of persuasion.'" *Id.*

### 1. Events at JFK

Plaintiffs have made out a *prima facie* case of race discrimination under Section 1981 and the NYHRL based on their experience at JFK. As to the first element of the *prima facie* case, there is no dispute that Plaintiffs are members of a racial minority. Plaintiffs have also satisfied the third element, as the alleged discrimination affected Plaintiffs' contractual rights to select seats on a first-come, first-serve basis for their outbound flight from JFK. The central dispute, therefore, is whether Defendant intended to discriminate against Plaintiffs on the basis of their race. Plaintiffs allege they were the only black or African-American passengers awaiting check-in for their outbound flight and that no other passengers were pulled out of line and made to wait for a significant amount of time before being allowed to board the plane. Allegations that Plaintiffs were treated differently than other passengers similarly awaiting check-in are sufficient to establish intentional discrimination at the *prima facie* stage. *See Feacher v. Intercont'l Hotels Grp.*, 563 F. Supp. 2d 389, 403 (N.D.N.Y. 2008) (McAvoy, J.) (*prima facie* inference of racial discrimination established where restaurant denied entrance to African American plaintiffs but seated two Caucasian couples).

Defendant has successfully proffered a non-discriminatory reason for its treatment of Plaintiffs at JFK, rebutting the inference of unlawful race-based discrimination. Viewing the facts in the light most favorable to Defendant and drawing all reasonable inferences in its favor, the Court concludes a reasonable trier of fact could find that the reason Plaintiffs were delayed from boarding their flight was the need to manually weigh Plaintiffs' eighteen pieces of checked luggage. *See* Jacoby Dep. Tr. at 55:11–56:25. The Court rejects, however, Defendant's

24

contention that Plaintiffs were delayed because of the need for additional security screening. Plaintiffs have shown, and Defendant has failed to rebut, that their passports were not taken for further screening. *See* Abdelgadir Dep. Tr. at 24:10–25:18; Def.'s 56.1 St. at ¶ 24; Pls.' Br. at 5.

Although Defendant's evidence that Plaintiffs' delay was the result of the need to weigh Plaintiffs' luggage is less than overwhelming, Defendant has carried its burden of production, and the Court does not engage in a credibility assessment of Defendant's evidence. *See St. Mary's Honor Ctr.*, 509 U.S. at 509. Therefore, the presumption of discrimination drops from the case, and Plaintiffs have the burden of showing Defendant's proffered non-discriminatory reason is pretextual. *See Weiss*, 260 F. Supp. 2d at 650–51. At this stage, not only must Plaintiffs show Defendant's reason is false, but they must also show the actual reason for the delay was intentional discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 515.

Because there are genuine issues of material fact regarding whether Defendant's proffered non-discriminatory reason is mere pretext for actual discrimination, the Court denies Plaintiffs' motion for summary judgment as to their claims for violations of Section 1981 and the NYHRL. Plaintiffs have not pointed to any evidence suggesting Defendant's reason was mere pretext. Moreover, Plaintiffs fail to produce any evidence, beyond their *prima facie case*, tending to show that intentional discrimination was the real reason behind Defendant's actions.

Plaintiffs argue that under New York law, "segregating a member of a minority class from the normal line of embarkation for a common carrier to wait at the end of the line, accompanied by the fear of not being carried by the conveyance, is discriminatory behavior when carried out in violation of company policy." Pls.' Br. at 16 (citing *Hudson Transit Lines, Inc. v. State Human Rights Appeal Bd.*, 47 N.Y.2d 971, 419 N.Y.S.2d 960, 393 N.E.2d 1033 (N.Y. 1979)). Plaintiffs also argue Saudi Arabia has a long and insidious history of

discrimination against "tribe-less blacks and foreign workers and Jews," implying Defendant, a company based in Saudi Arabia, operates in a discriminatory manner and did so when it prevented Plaintiffs from boarding at JFK for several hours. *Id.* at 17. In support of this argument, Plaintiffs submit the expert report of Mr. Toby Jones, which "points out the incredible discriminatory nature of Saudi society" and blames the experience of the Aboeid family on Saudi Arabian society's general intolerance against "blacks who do not belong to a Saudi tribe." *Id.* at 6, 17. The Court addresses each argument in turn.

Plaintiffs' invocation of *Hudson Transit* to show intentional discrimination fails. In *Hudson Transit*, the trial court found that a bus driver had acted with discriminatory intent when he ordered two Native American passengers to go to the end of the line, contrary to company policy, and then refused to transport the passengers at all. 47 N.Y.2d at 973. The Court of Appeals affirmed, concluding there was "substantial evidence to support the finding of conscious discrimination," based on the factual findings and credibility assessments made by the State Division of Human Rights. *Id.* at 972–73. In other words, while segregating a member of a minority class from the normal line of embarkation for a common carrier and refusing to transport that passenger may constitute discriminatory behavior in the absence of any credible non-discriminatory rationale for the differential treatment, the determination of whether such actions constitute intentional discrimination are properly left to the factfinder.

Separately, the Court notes that the New York Court of Appeals in *Hudson Transit* made no mention of the plaintiffs' "fear of not being carried." Indeed, it would be strange for a finder of fact to infer intentional discrimination on the part of a bus carrier based on a plaintiff's subjective fear that the carrier would not transport him. Thus, to the extent Plaintiffs feared

Defendant would not board them on the outbound flight from JFK, that fear is irrelevant to the issue of intentional discrimination.

The Court likewise rejects Plaintiffs' attempt to prove intentional discrimination through an expert report on the history of racism in Saudi Arabian society. Plaintiffs characterize the expert report as the type of "circumstantial evidence" litigants routinely use to prove discriminatory intent. Pls.' Br. at 17; *see, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) ("[T]he *McDonnell Douglas* formula does not require direct proof of discrimination."); *Lizardo*, 270 F.3d at 104 ("The record is barren of any direct evidence of racial animus. Of course, direct evidence of discrimination is not necessary."). However, evidence that Saudi Arabian society has historically discriminated or presently discriminates against individuals of African descent is not proper circumstantial evidence of Defendant's intent during the events at JFK. Instead, such evidence is essentially character evidence and runs afoul of the prohibition against the use of such evidence. *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Moreover, Plaintiffs' expert report describes not the character of Defendant, but of the country in which it is based. As such, the evidence is doubly inadmissible and will not be considered by the Court in determining whether Plaintiff has demonstrated Defendant intentionally discriminated against Plaintiffs.

Because the Court rejects the preceding two arguments regarding intentional discrimination, the only cognizable evidence of intentional discrimination is that supporting Plaintiffs' *prima facie* case—*i.e.*, Plaintiffs were the only black or African-American passengers on the check-in line, and Plaintiffs were the only passengers segregated from the line. While a finder of fact could ultimately conclude that Defendant intentionally discriminated against

27

Plaintiffs on these facts alone, viewing the record in the light most favorable to Defendant, a reasonable factfinder could likewise decide Defendant did not discriminate against Plaintiffs. It would therefore be inappropriate for the Court to conclude, as a matter of law, that summary judgment is appropriate for Plaintiffs as to their Section 1981 and NYHRL claims. Accordingly, Plaintiffs' motion for summary judgment as to their claims under Section 1981 and the NYHRL, with respect to the events at JFK, is denied.

### 2. Events in Jeddah

The Second Circuit has unequivocally held that 42 U.S.C. § 1981 does not apply to conduct that occurs extraterritorially. *See Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 301–05 (2d Cir. 2006) ("[T]he relevant inquiry is whether the particular acts of discrimination occurred while plaintiff was 'within the jurisdiction of the United States,' . . . or whether they occurred when plaintiff was outside the jurisdiction of the United States and therefore beyond the prescribed reach of Section 1981.") (internal citation omitted); *see also Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 213 (E.D.N.Y. 2012) (Dearie, J.) (dismissing Section 1981 claim arising from conduct occurring outside the United States). Likewise, "the NYHRL provides explicitly for its extraterritorial application but does so in limited fashion." *Torrico v. Int'l Bus. Machs. Corp.*, 213 F. Supp. 2d 390, 406 (S.D.N.Y. 2002) (Lynch, J.). "In order to state a claim under the [NYHRL] . . . it is necessary to allege either that 'a discriminatory act was committed in New York or that a New York State resident was discriminated against.'" *Id.* at 407 (quoting *Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 273, 541 N.Y.S.2d 428, 429 (N.Y. App. Div. 1st Dep't 1989)). In this case, any discrimination Plaintiffs suffered in Jeddah occurred outside the jurisdiction of New York or the United States, and Plaintiffs are not New York residents. Therefore, neither Section 1981 nor the NYHRL applies to the events in Jeddah.

Accordingly, Plaintiffs' motion for summary judgment as to their claims under Section 1981 and the NYHRL, with respect to the events in Jeddah, is denied.

### IV.   Conclusion

For the reasons stated above, the Court DENIES Plaintiffs' motion for summary judgment with respect to their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of Section 1981 and the NYHRL.

**SO ORDERED**

Dated:     Brooklyn, New York          s/WFK
           July 2, 2013

                                       _____
                                       HON. WILLIAM F. KUNTZ, II
                                       United States District Judge

29